## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ROGER SNYDER,** | : | |
| | : | |
| **Plaintiff,** | : | **Civil No. 1:09-CV-927** |
| | : | |
| **v.** | : | **(Judge Stengel)** |
| | : | |
| **DANIEL BENDER, et al.,** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **Defendants.** | : | |

## REPORT AND RECOMMENDATION

## I.  INTRODUCTION

Roger Snyder is an elected official in West Donegal Township, Lancaster County, Pennsylvania, who has served continuously on the West Donegal Township Board of Supervisors since 1995. Snyder was reelected to this office in 2007, and his current term in office runs until 2013. Notwithstanding his long running success in local politics, and a public role that is scheduled to last for, at minimum, 18 years, Snyder brought this lawsuit in 2009 against a number of local township supervisors, state ethics officials, and one private citizen, alleging that these defendants retaliated against him in violation of his First Amendment right to run for political office in West Donegal Township, Lancaster County, Pennsylvania, during 2007.[1]

---

[1] One of the defendants, Keith Murphy, is and at all times throughout this complaint has been a private citizen. Another defendant, Ralph Horne, was a private citizen during the relevant time periods at issue in this action, but was later

The defendants in this case include three officials with the Pennsylvania State Ethics Commission, Daniel Bender, Robert Caruso, and John Contino, all of whom were involved in some capacity in authorizing or conducting an official investigation into allegations that Mr. Snyder had used Township property or resources for his own personal gain, including in connection with his political campaign in 2007. Plaintiff has also named a number of employees or elected officials from West Donegal Township, including: Ralph Horne, who was a private citizen during the operative times alleged in the complaint, but who has since been elected to local office; Nicholas Viscome, the Township Manager; Charles Tupper, a Supervisor; and Jeffrey Templin, Sr., the Township Road Master. Finally, plaintiff has sued Keith Murphy, a private citizen who ran against the plaintiff for a seat on the West Donegal Township Board of Supervisors in 2007.

Plaintiff claims that all of these defendants improperly caused him to be subjected to an ethics complaint and subsequent formal investigation after he was discovered to have used township equipment and property in connection with his political activity and for personal gain. Snyder alleges that the defendants conspired with one another to violate his First Amendment right to run for political office, and that they also acted individually in this regard. Plaintiff takes a particularly dramatic

---

elected to local office. (Compl., at ¶ 8; Doc. 104, ¶ 44.)

and even historic view of the activities alleged in the complaint, summarizing his interpretation of the alleged events as "a Boss Tweed/Tammany Hall machine-esque political conspiracy and power grab, with plaintiff as its target, in a rural Lancaster County enclave." (Doc. 137, at 6)

Defendants have a decidedly more measured view of plaintiff's allegations and their import, and collectively take the position that plaintiff has failed to support his claims of conspiracy and civil rights violations with substantive evidence, or otherwise that the claims simply fail as a matter of well-established constitutional law. Accordingly, the defendants have now filed three separate motions for summary judgment. (Docs. 98, 102, 105) The motions have been fully briefed by the parties, and are ripe for disposition. The motions have been referred to the undersigned for the purposes of preparing a report and recommended disposition. For the reasons that follow, it is recommended that each of the motions be granted, and the case be closed.

## II.   BACKGROUND

Plaintiff Roger Snyder is a West Donegal Township Supervisor, and has served on the Township Board of Supervisors since he first won election in 1995. In 2007, Snyder's term was set to expire and he decided to run for re-election with Nancy Garber, another Board member whose term was also expiring in 2007; the two campaigned as a team. (Doc. 105, Ex. 1, Deposition of Roger Snyder, at 10, 16-18)

During the same election year, Keith Young, a defendant in this action, also ran for a seat on the Board during both the primary and general elections. (Id., at 13-16.) In that year, there were two available seats up for election. (Id., at pp. 16-24.) According to Mr. Murphy, he told the plaintiff in February 2007 that he was running in order to take Ms. Garber's seat. (Id., at p. 18.) As it turned out, the three candidates were competing for two available seats.

The primary election was held in May 2007. Prior to and in connection with that election, Snyder asked a Township employee, Amanda Willenbecher, to copy campaign material using Township equipment for himself and Ms. Garber. (Id., at p. 52; Compl., ¶ 18.) According to the plaintiff, he and Ms. Garber were invoiced for the cost of this copying job, and they paid the bill charged by the Township. (Id.) Snyder insists that he merely asked Ms. Willenbecher to perform this service, and that she agreed to do so after getting approval from her supervisors. (Id.)

On or about July 31, 2007, defendant Ralph Horne, a resident of West Donegal Township, filed a complaint against Mr. Snyder with the State Ethics Commission. (Doc. 110, State Ethics Commission Complaint) In the complaint, defendant Horne alleged that Mr. Snyder had "required" Township office to use supplies and labor to create Mr. Snyder's campaign literature during the May 2007 primary election. (Id.) Mr. Horne noted that although Mr. Snyder had reimbursed the Township for the cost

4

of the copies, he had not paid for the labor involved.  (Id.)  In addition, Mr. Horne alleged that Mr. Snyder had used a Township street roller to roll a new driveway at a rental property that Mr. Snyder owned within the Township, and that he did not reimburse the Township for the use of the equipment.  (Id.)  Mr. Horne also claimed that Mr. Snyder was using Township dumpsters to dispose of personal trash.  (Id.)  Finally, Mr. Horne alleged that Mr. Snyder had stolen copper wiring from a demolition site in the Township, and that he had performed work at his rental property without obtaining necessary inspections.  (Id.)  Mr. Horne testified during his deposition that before and after he filed his formal complaint, he never brought the matter to the attention of Charles Kraus, who was at that time the Chief of the Northwest Regional Police.  (Doc. 119, Deposition of Ralph Horne, at 24)

The following month, on August 17, 2007, Chief Kraus sent his own letter to the State Ethics Commission, alleging "possible ethics violations on the part of Supervisor Snyder and possibly that of Supervisor Garber."  (Doc. 111)  In the letter to defendant Robert P. Caruso, the Deputy Executive Director of the Commission and the Director of Investigations, Chief Kraus represents that he had been contacted by Township employees "numerous times over the past two weeks" regarding allegations of improper use of township employees and equipment.  (Id.)  Included among the various allegations of misfeasance were allegations that essentially mirrored those

made by defendant Horne, including that Mr. Snyder had directed a Township employee to run 1,600 color copies on the Township copy machine, and to do so discretely. (Id.) Chief Kraus represented that Township employees were frustrated with what they perceived to be clear ethics violations and possible criminal conduct on Mr. Snyder's part, and that they had informed him they were willing to speak to investigators in order to "put a stop to abuse of tax payer's money as soon as possible." (Id.)

Apparently unaware of the allegations that had been made against him, later that fall, in connection with the November 2007 general election, Snyder again asked Ms. Willenbecher to photocopy campaign literature on Township equipment for himself and Ms. Garber. (Doc. 114, Snyder Dep., at p. 43) Ms. Willenbecher undertook this copying job on October 31, 2007. (Id., at p. 92.) Apparently while the office staff was making the requested copies, one of the Township Supervisors, Defendant Charles Tupper, was alerted about the activity. (Id., at p. 47.) Defendant Tupper called Chief Kraus to alert him about the copying; both men went to the Township building after learning of the allegations.

At the same time, while the office staff was running off the copies, members of the local media arrived at the Township building, including a reporter from a local television station. Defendant Tupper and Chief Kraus both made statements to a

newspaper reporter about the incident, and Chief Kraus gave a statement indicating that he had spoken with the Lancaster County District Attorney's office about the photocopying that was discovered, and the District Attorney recommended that the matter be turned over to the State Ethics Commission.  (Doc. 118, Deposition of Charles Kraus, at 60; Exhibits 2 and 3)

On Thursday, November 1, 2007, an article on the front page of the <u>Lancaster Intelligencer Journal</u> titled "West Donegal Official Probed" detailed allegations that Mr. Snyder had used Township employees to aid his campaign, and indicated that the State Ethics Commission would be handling the investigation into the matter.  (Doc. 112)  In the same article, Roger Snyder was quoted as stating, "Yes, I asked (staff) to run off the copies . . . ."  (<u>Id.</u>)

Another article published the same day in the <u>Lancaster New Era</u> read, in part, as follows:

> Officials in northwest Lancaster County claim a West Donegal Township supervisor ordered staff to run off thousands of campaign fliers on a copy machine owned by the municipality.

> Using taxpayer resources for political purposes is against state law.  Northwest Regional Police Chief Casey Kraus and county District Attorney Donald Totaro said details and evidence of the supervisor Roger Snyder's actions were turned over to the state Ethics Commission.

> "It is the position of the Northwest Regional Police Department that we believe this is a serious problem," Kraus said. "However, it's not our position to investigate, so we turned it over to the proper agency."

(Doc. 113)  Snyder was also copied in the article acknowledging that he had "asked" staff to run off the copies for him.  (Id.)  For her part, Nancy Garber professed to know nothing about the use of Township equipment for this purpose, and called the situation "disappointing."  (Id.)

On October 31, 2007, Mr. Snyder became aware that he was being investigated by the State Ethics Commission, and on November 2, 2007, Mr. Snyder's wife received formal notification of the investigation from the Commission in the mail. (Snyder Dep., at 82.)

The general election was held five days after these articles were published, and thus by election day the information about the plaintiff's admitted use of Township equipment and personnel to photocopy his campaign material had been publicized in the area.  (Snyder Dep., at 32.)  Mr. Snyder testified that he believes Chief Kraus was the source of the information provided to local news media outlets concerning the State Ethics Commission's investigation into the allegations against Mr. Snyder.  (Id., at 36-37.)

Plaintiff claims that on election day, someone was found to be distributing on

Mr. Murphy's behalf a yellow campaign flier bearing the headline "State Ethics

Commission Investigates Roger Snyder," and which read, in part, as follows:

> The State Ethics Commission has determined that Section
> 1103(a) of the State Ethics Act prohibits municipal
> employees from using local government staff, time, and
> equipment for non-governmental matters.
>
> Roger Snyder, West Donegal Supervisor of 12 years,
> allegedly ordered township staff to run off thousands of
> colored campaign fliers.  (Office Max charges $2,360 for
> 2,000 double-sided copies.)
>
> Roger is seeking a 3rd 6 year term.   The Northwest
> Regional Police were notified.  Police Chief Casey Kraus
> responded, confiscated the copies, and contacted the
> County District Attorney.   The investigation is being
> turned over to the State Ethics Commission.  Roger was
> also cited in 2003.

(Doc. 119, Deposition of Ralph Horne, Ex. 1)  Although he found this flier to be

underhanded, and to violate what he understood to be confidentiality provisions of

the State Ethics Act, Mr. Snyder conceded that it contained truthful information that

had been publicized in the local media prior to election day, although he disputed the

allegation that he had "ordered" staff to do this work, and he noted that he was not

actually cited in 2003, but instead was disciplined for "two unintentional violations"

in 2005.  (Doc. 114, at p. 33, 38, 79-81)    Plaintiff does not know whether Mr.

Murphy prepared the flier, or whether some other unknown person prepared it on his behalf.  (Doc. 114, at 29)

For his part, Mr. Murphy testified that he did not distribute the flier on election day, and he does not know who prepared the flier or caused it to be distributed.  (Doc. 123, at 6-11, 19-22)  Instead, he testified that he prepared all of his own campaign material, in black-and-white, at home, using a computer, printer, and copier.  (Id., at 49-51.)  Plaintiff has presented no evidence to support his allegations that Mr. Murphy had anything to do with the flier's creation or its distribution.

Plaintiff similarly admitted that he has no evidence that defendant Tupper distributed the flier on election day.  (Doc. 114, Snyder Dep., at 64, 98)  For his part, defendant Tupper testified that he never saw the flier.  (Doc. 121, at 67)

Defendant Jeffrey Templin, who was at all relevant times the West Donegal Township Road Master, similarly testified that he did not see the flier on election day, did not recall seeing anybody handing the flier out, and did not personally distribute any campaign material on Mr. Murphy's behalf.  (Doc. 122, Deposition of Jeffrey Templin, Sr., at 32, 34)  Plaintiff testified that he has no knowledge that defendant Templin had anything to do with the flier.  (Snyder Dep., at 71.)

Nick Viscome, the Township Manager, maintained a personal policy not to involve himself in the campaign of any candidate, or in their elections, and instead

testified that he has always committed to working with anyone who is ultimately elected.   (Doc. 120, Deposition of Nicholas Viscome, at 24-25)   Although the plaintiff testified during his deposition that he suspected defendant Viscome had something to do with the creation of the election day flier or with its distribution, he had admitted to having no evidence to support this suspicion.  (Snyder Dep., at 66-71.)

Similarly, Ralph Horne, who originally filed a formal complaint with the Commission in July 2007, testified that he did not share any information about the investigation or allegations against Mr. Snyder with newspapers or other media outlets, and he testified that he had never seen the political flier alleging misconduct on Mr. Snyder's part until he was shown a copy in 2011.  (Horne Dep., at 51, 59.) Although there was some suggestion made during the plaintiff's deposition that certain witnesses would testify that they had seen Mr. Horne distributing the political fliers revealing the investigation into Mr. Snyder on election day, the plaintiff has come forward with no evidence of Ralph Horne doing anything other than filing a complaint about him with the Commission.  (Snyder Dep., at 93.)

Following the general election on November 6, 2007, plaintiff was re-elected as a Supervisor.   Nevertheless, he claims that as a result of the allegations made against him regarding unethical and even criminal conduct, his standing in the

community has been damaged.  He claims that he has been further injured by the formal investigation that the State Ethics Commission undertook as a result of the allegations against him – an investigation that ultimately resolved itself in the plaintiff's favor.

That investigation was formally commenced on November 1, 2007, following a roughly two-month preliminary investigation that defendant Daniel Bender commenced in September 2007, following his receipt of Charles Kraus's allegations of misconduct on Mr. Snyder's part.

Defendant Bender has been a Senior Investigator with the State Ethics Commission for approximately 12 years.  (Doc. 115, Deposition of Daniel Bender, at 14)  Defendant Bender's immediate supervisor is defendant Robert Caruso, the Director of Investigations for the Commission.  (Id. at 14; Doc. 116, Deposition of Robert Caruso, at 43.) Defendant Caruso reports to defendant John Contino, the Commission's Executive Director.  (Doc. 117, Deposition of John Contino, at 12)

The State Ethics Commission receives complaints about potential ethics violations either by notarized written complaint forms or by referrals from Commonwealth law enforcement agencies.  (Bender Dep., at 58-59.)  When the Commission receives a complaint, it is date-stamped and forwarded to Robert Caruso for review.  (Bender Dep., at 60; Caruso Dep. at 39.)  If it is determined that the

complaint involves a matter that falls within the Commission's jurisdiction, Mr. Caruso drafts a memorandum advising Executive Director Contino of the allegations. (Doc. 106, ¶ 10)  When determining whether to conduct an investigation, defendant Caruso testified that he does not consider the timing of political elections.  (Id. ¶ 11.)

If Executive Director Contino determines that a preliminary investigation into a complaint is appropriate, he authorizes the investigation and refers the matter back to Caruso, who assigns the complaint to an investigator.  (Bender Dep., at 60-61; Contino Dep., at 48.) When an investigation is undertaken, the investigators typically do not know the identity of the complainant.  (Bender Dep., at 24.)

When conducting investigations, the Commission maintains a policy of keeping complaints, investigations, and the identity of complainants confidential. (Caruso Dep., at 42.)  In addition, fact witnesses who may be interviewed by investigators are advised to respect the confidentiality of the investigation.  (Id., at 17.)

Following the Commission's receipt of Charles Kraus's complaint in August 2007 regarding Roger Snyder's alleged misuse of Township property and resources, an investigation was authorized, Daniel Bender was assigned to the matter, and he began his investigation in September 2007.  (Bender Dep., at 28.)  Applicable law governing the Commission requires that preliminary inquiries into complaints be

completed within 60 days of initiation.  (Bender Dep., at 35-36.)  The purpose of a preliminary investigation is to allow the Commission to determine whether a *prima facie* case exists with respect to an alleged ethics violation, and to decide whether a full investigation is warranted.  (Id., at 36.)

With respect to Charles Kraus's allegations against the plaintiff, Mr. Bender completed his preliminary investigation on or around October 12, 2007.  (Bender Dep., at 35.)  Thereafter, on November 1, 2007, Executive Director Contino approved a full investigation into the allegations against Mr. Snyder.  (Bender Dep., at 37; Caruso Dep., at 17; Contino Dep., at 23-24, 27.)  Robert Caruso, the Director of Investigations, drafted the allegations that were listed on the notice of investigation that was sent to the plaintiff on November 1, 2007, based upon the results of Daniel Bender's preliminary investigation.  (Caruso Dep., at 28-29.)

The State Ethics Commission did not send the November 1, 2007,  notice of investigation, or any information contained therein, to anyone other than Roger Snyder.  (Bender Dep., at 37, 59, 63-64; Caruso Dep., at 29; Contino Dep., at 21, 28-31.)  However, the Commission did notify that complaining party – in this case, Charles Kraus – that an investigation had been initiated.  (Bender Dep., at 59, 61; Contino Dep., at 25.)  With respect to information contained in the political flier distributed on election day suggesting that the Ethics Commission was investigating

Roger Snyder, Daniel Bender testified unequivocally that he was not part of any plan to publish flier or engage in political activity in an effort to "try and hurt Mr. Snyder at the polls." (Bender Dep., at 63.)

As part of his investigation, Daniel Bender interviewed Ralph Horne, Roger Snyder, Charles Kraus, and other witnesses. (Bender Dep., at 34, 39; Horne Dep., at 29.) According to the plaintiff, the only relationship between the Commission defendants and the Township defendants of which he is aware is that Ralph Horne filed a complaint with the Commission. (Snyder Dep., at 130-36.) Plaintiff also attempts to suggest some connection between the Township defendants and the Ethics Commission defendants by speculating that Daniel Bender may have shared information about his investigation with Charles Kraus – someone who is not a defendant in this case. As summarized below, however, the evidence does not indicate that there was any information sharing between these individuals with respect to the Snyder investigation.

Charles Kraus was the Chief of the Northwest Lancaster County Regional Police Department, which served West Donegal Township and other municipalities, from 2003 until 2008. (Doc. 118, Deposition of Charles Kraus, at 12-13) As indicated above, after learning that Roger Snyder had been using Township equipment, resources, and staff for personal reasons over several months, he compiled

this information and eventually sent correspondence to Robert Caruso at the State Ethics Commission in a letter dated August 17, 2007, detailing the information he had received. (Id., at 22-25, 32, 42-43.) John Contino, the Executive Director of the State Ethics Commission testified that it is routine for law enforcement agencies throughout the Commonwealth to send information about potential ethics violations to the Commission. (Contino Dep., at 44-45.)

At the time he sent his letter, Charles Kraus did not know Robert Caruso, and found his name only after visiting the State Ethics Commission website. (Caruso Dep., at 12-13; Kraus Dep., at 32.) Indeed, Kraus did not know anybody at the State Ethics Commission at the time he sent his letter. (Kraus Dep., at 33.) As the election in the fall of 2007 approached, Kraus received information that Township employees were copying campaign literature at the Township building, prompting Kraus to visit the site. (Kraus Dep., at 24-26, 59.)

After discovering the copying that was occurring, Kraus gave a statement to the media acknowledging that he had discussed the copying matter with the Lancaster County District Attorney, who had recommended that the matter be turned over to the State Ethics Commission. (Kraus Dep., at 58-60.)

Daniel Bender interviewed Kraus about Snyder's use of Township resources for personal reasons, and Robert Caruso only obtained information from Charles

Kraus that was also provided by other sources.  (Bender Dep., at 45; Caruso Dep., at 27.)  For his part, defendant Contino never communicated with Charles Kraus in any way.  (Contino Dep., at 15-16, 31, 44.)  It appears from the record evidence that despite this limited contact between Charles Kraus and the Ethics Commission defendants, Mr. Snyder believes that Daniel Bender conducted his official investigation in a manner to affect the plaintiff's political campaign by keeping Kraus "in the loop" about the investigation.  (Snyder Dep., at 165.)  Indeed, Snyder acknowledged that he does not know whether Bender ever discussed Snyder's political campaign with Kraus.  (Id., at 166-67.)

It also appears that the plaintiff may be attempting to suggest a conspiracy or other "meeting of the minds" between the Ethics Commission defendants and the Township defendants by noting that Daniel Bender exchanged email with another non-defendant in this case, Amanda Willenbecher – the Township employee plaintiff asked to copy his campaign materials in the spring and fall of 2007 using Township resources.  (Snyder Dep., at 143-48; Exhibit A-1.)

In the first email, dated November 2, 2007, Ms. Willenbecher asks Bender what she should do about the campaign materials that had been confiscated by Charles Kraus following Kraus's discovery of the copying that was taking place, and whether she should bill Snyder for the job. (Snyder Dep., at 144-45; Exhibit A-1.)  Daniel

17

Bender responded that he could not tell her how she should handle the situation. (Snyder Dep., at 144-46; Exhibit A-1.)  Ms. Willenbecher sent a follow-up email to Bender on November 5, 2007, but Bender did not respond.  (Snyder Dep., at 146; Exhibit A-1.)  Notably, this exchange occurred after John Contino had authorized a formal investigation.  (Contino Dep., at 40-41.)  The foregoing represents the entirety of the evidence of Bender communicating with Ms. Willenbecher.

The investigation into Snyder's alleged ethics violations continued into 2008, after which Snyder was exonerated of wrongdoing.  This lawsuit followed on May 17, 2009.

## III.   <u>STANDARD OF REVIEW</u>

Federal courts are permitted to summarily adjudicate an action in order to dispose of those claims that do not present a "genuine issue as to any material fact," Fed. R. Civ. P. 56, and for which a jury trial would therefore "be an empty and unnecessary formality," <u>Pained v. Sabol</u>, No. 09-355, 2010 U.S. Dist. LEXIS 134131, 2010 WL 5300563, at *2 (M.D. Pa. Dec. 20, 2010).  Rule 56 specifically provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The substantive law identifies which facts are material, and

"[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party.  Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact.  Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004).  Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).  If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate.  Celotex, 477 U.S. at 322.  Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249.   There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the

material facts.  Id. at 252; see also, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In making this determination, the court must "consider all evidence in the light most favorable to the party opposing the motion."  A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 794 (3d Cir. 2007).

## IV.   DISCUSSION

### A.    The Scope of Plaintiff's Claims in this Action

Before addressing the substantive arguments presented in each of the three pending motions for summary judgment, it is first necessary to resolve an issue that plaintiff appears to believe remains a lingering point of dispute in this case, specifically relating to the proper scope of this action and the claims brought against the defendants.

In his briefs, plaintiff has suggested that he has brought claims against the defendants in this case for: conspiracy to violate plaintiff's First Amendment right to run for public office and right of association; retaliation for plaintiff's exercise of First Amendment rights; interference with plaintiff's access to the courts; malicious prosecution; a "Fourteenth Amendment liberty interest claim," (Doc. 141, p. 33); violations of plaintiff's right to equal protection under the Fourteenth Amendment; and violation of plaintiff's right to substantive due process under the Fourteenth Amendment.

As discussed below, plaintiff has impermissibly attempted to expand the scope of the claims in this action through argument in his briefs.  In fact, since May 2010, plaintiff's claims have been limited to assertions that the defendants violated his First Amendment right associated with his campaign for election to public office in West Donegal Township.  We explain further, for the benefit of the District Court, the parties, and the record in this case.

Plaintiff commenced this action on May 17, 2009.  In its original form, the complaint named 13 defendants and included a wide variety of claims.  (Doc. 1)  The defendants filed motions to dismiss the complaint in July, September, October, and December of 2009, (Docs. 7, 18, 23, 30), which were briefed by the parties, (Docs. 8, 12, 19, 20, 21, 24, 26, 27, 31), and thereafter resolved by the District Court in an order dated May 25, 2010.  (Doc. 47)

While the motions to dismiss were pending, on March 14, 2010, the plaintiff filed a document styled as an amended complaint.  (Doc. 35)  The plaintiff filed this pleading without obtaining leave of court, and the defendants responded by moving to have it stricken.

In its May 25, 2010 order the District Court specifically addressed this amended complaint, and the motions to have it stricken, ordering that the:

> Plaintiff's amended complaint (Doc. No. 35) is **STRICKEN** for failure to comply with Federal Rule of Civil Procedure 15(a). Accordingly, the Defendants' motions to dismiss the amended complaint (Doc. Nos. 36, 37, 39, 40, 41) are deemed moot.

(Doc. 47, p. 17)  In short, the District Court found that because the plaintiff had failed to seek leave of court to file an amended complaint, and had not filed the amended complaint within the 21-day period following the filing of the motions to dismiss, as required by Rule 15 of the Federal Rules of Civil Procedure, the amended complaint should be stricken.  However, the Court provided the plaintiff with leave to amend his complaint in other respects, provided that the plaintiff acted within 21 days of the Court's May 25, 2010 order.  Nevertheless, after being provided with leave of court, and with specific directions to amend file a complaint in accordance with the court's order, the plaintiff failed to do so.

The District Court's May 25, 2010 order also clarified, and limited, the scope of plaintiff's complaint in this action.  In short, the Court dismissed with prejudice plaintiff's claims of equal protection and due process violations, as well as all of plaintiff's claims against defendant Robin Hittie.  (Id.)  As a result, plaintiff's claims in this case were limited to claims for First Amendment violations against defendants

Daniel Bender, Robert Caruso, John Contino, Ralph Horne, Charles Tupper, Keith Murphy, Nicholas Viscome, and Jeffrey Templin, Sr.[2] (Id.)

On September 8, 2010, the case was referred to the undersigned for pre-trial management.  (Doc. 52)  Following a September 10, 2010, case management conference, we entered an order that provided the plaintiff with yet another opportunity to correct or amend his pleadings.  Specifically, that case management order provided that:

> In order to allow the Plaintiff's newly retained counsel sufficient time to become familiar with the history of this case, the deadline for amendment of pleadings/joinder of parties is extended as follows: Any amendment of pleadings or joinder of additional parties shall be completed on or before November 10, 2010.

(Doc. 55)

---

[2] Plaintiff had also brought claims against Charles Kraus, who at all times relevant to this action was the Chief of the Northwest Regional Police.  As noted below, plaintiff never properly served Kraus, and Kraus was ultimately dismissed from this case for lack of service.  On December 9, 2010, the District Court issued an order dismissing defendant Charles M. Kraus, III from this action without prejudice for defective service.  Plaintiff never served Kraus properly, and his efforts to reinstate his claims against Kraus were rejected as untimely and improper in the Court's order denying plaintiff's motion to amend. Plaintiff later tried to reinstate his original claims against Kraus as part of effort to amend his complaint, but the Court denied his motion as untimely and improper, and Casey Kraus was never reinstated as a defendant in this action.  Accordingly, plaintiff has no claims in this case against Charles Kraus.

Thus, plaintiff was permitted an additional two months in which to amend his complaint. Nevertheless, once again plaintiff's counsel failed to act, allowing this deadline also to lapse without seeking to amend the complaint. Instead, the plaintiff waited until February 21, 2011, a full three months after the revised deadline for filing amended pleadings had lapsed, before seeking leave to file an amended complaint. (Doc. 70) Snyder's motion did not address in any fashion this delay in moving to amend his complaint. Furthermore, the tardy amended complaint, in large part, simply restated claims that had already been found wanting, and which had been dismissed by the District Court. (Id.) Defendants opposed plaintiff's motion to belatedly amend his complaint by reincorporating claims that had previously been dismissed, and upon consideration of the parties' briefs, on March 21, 2011, this Court entered an order denying plaintiff's motion to refile the amended complaint that had previously been stricken by the District Court on May 25, 2010. (Doc. 81)

Undeterred, or under the impression that the Court had not already denied his motion, the plaintiff elected to file a brief in support of his motion on April 4, 2011. (Doc. 90)   On the same day, in somewhat contradictory fashion, plaintiff misconstrued the Court's *order* denying plaintiff's motion to amend, as a ***report and recommendation*** to the District Court, and apparently for that reason filed a document styled as an "objection" to this order.  (Doc. 89)  Thereafter, further

24

compounding the procedural confusion that he had caused through these contradictory filings, on April 13, 2011, plaintiff filed a motion for reconsideration of this Court's order denying the motion to amend. (Doc. 93)  On April 14, 2011, endeavoring to resolve any lingering confusion on this matter, the Court denied plaintiff's motion for reconsideration.  (Doc. 95)

Now, after this matter has unequivocally been addressed, and resolved, plaintiff once again has suggested that his claims include not only that the defendants conspired to violate his right under the First Amendment to run for political office, but also to assert claims that the defendants violated his First Amendment right of association; retaliated against plaintiff for exercising his First Amendment rights; interfered with plaintiff's right of access to the courts; caused plaintiff to be subject to malicious prosecution; violated plaintiff's "Fourteenth Amendment liberty interest," (Doc. 141, p. 33); infringed plaintiff's right to equal protection under the Fourteenth Amendment; and violated of plaintiff's right to substantive due process under the Fourteenth Amendment.  Apparently in support of this purported expansion on his claims in this case, plaintiff has suggested that at the time the motions for summary judgment were being briefed he had filed a "motion for reconsideration of the magistrate's refusal to reinstate the amended complaint filed by plaintiff on March 14, 2011, and stricken by Judge Kane." (Doc. 141, n.1)  As the foregoing recitation

of the procedural history regarding the pleadings in this case makes clear, plaintiff is incorrect.

At the time the motions for summary judgment were filed, the Court had unequivocally denied plaintiff's efforts to amend his complaint, and to reinstate claims that the District Court had already found wanting.  Although plaintiff disagreed with this ruling, and sought reconsideration, this motion was also denied. In short, the Court found no basis to permit plaintiff's belated efforts to amend his complaint after he had entirely disregarded the District Court's earlier instructions regarding a permissive amendment, and this Court's orders setting another deadline for amending the pleadings and joining parties.

Plaintiff's unwillingness to accept these prior rulings, and his insistence either that these issues remain unresolved, or that they have been resolved unfairly by the Court, is at this stage of the litigation irrelevant.  Plaintiff's claims in this action are now, and have been since May 25, 2010, limited to his contention that the defendants conspired against him to violate his First Amendment right to run for political office. Accordingly, the Court will consider defendants' motions with respect to these remaining claims, and will decline plaintiff's invitation to find that this action should be opened up to include additional causes of action that were never properly brought.

**B.     The Defendants Are Entitled to Summary Judgment on the Remaining Claims**

**1.  Summary of the Parties' Arguments**

In their motion, the Ethics defendants initially observe that there is nothing unlawful about the State Ethics Commission conducting official investigations of potential ethics violations that are brought to the Commission's attention, and, therefore, assert that the entire basis for plaintiff's complaint against these parties hinges upon plaintiff's claim that the Ethics defendants conspired with others to violate plaintiff's First Amendment rights.  Having narrowed the potential scope of plaintiff's claims against them, defendants contend that plaintiff lacks evidence to support the claim.

The Township defendants – Messrs. Horne, Templin, Tupper, and Viscome – similarly assert that plaintiff has come forward with no evidence to support his claim either that the parties conspired with one another, or that Mr. Snyder suffered a First Amendment violation in the first instance.   Defendants Tupper, Templin, and Viscome also assert that they are entitled to qualified immunity from the plaintiff's claims.  Ralph Horne further argues that he cannot be liable for any violation under 42 U.S.C. § 1983, since he was not a state actor at the time, and the statute expressly proscribes only actions by state actors taken to violate another constitutional or

federal rights.  For his part, Keith Murphy makes a similar argument, observing that

he is not, and has never been, a state actor who could have violated 42 U.S.C. § 1983.

In response, the plaintiff states that the although the "conspiracy [was]

admittedly hatched by the Township operatives – Kraus, Tupper, Horne, Murphy, and

Viscome", each of the Ethics defendants "became knowingly and intentionally

involved" in this alleged conspiracy to violate plaintiff's First Amendment rights.[3]

(Doc. 137, p. 21)  For evidentiary support of this assertion, plaintiff relies almost

entirely upon his own declaration, which he filed in this case despite having

previously been deposed.  (Doc. 136)  Plaintiff relies on the same declaration to

support his assertion that the parties, individually and collectively, violated his First

Amendment rights.  Review of plaintiff's brief, however, along with his declaration,

reveals that he has no evidence other than rank speculation, unfounded inferences,

and speculative conclusions that he urges the Court to rely upon in concluding that

there remain unresolved issues of fact that make summary judgment in favor of the

_____

[3] In making this assertion, the plaintiff continues to assert that Charles
Kraus remains a defendant in this action.  He is not, having been previously
dismissed, as discussed above.  Additionally, although he knows that defendants
Horne and Murphy were not state actors, he nevertheless argues that certain
unidentified evidence demonstrates that they were purposely working with
Township leaders and officials to violate his rights, and should therefore be
construed as state actors for purposes of 42 U.S.C. § 1983.  As we explain,
plaintiff has not shown sufficient evidence to support this assertion.

Ethics defendants inappropriate.  Upon consideration, we do not find that plaintiff can avoid his failure to identify record evidence to support his claims by relying upon a self-declaration that he offered, despite having already been deposed in the case, particularly as the declaration itself relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony.  See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (the nonmoving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with the conclusory allegations of an affidavit."); Iseley v. Beard, No. 02-2006, 2009 U.S. Dist. LEXIS 52014, *32 (M.D. Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence cannot be accepted as true).  Quite the contrary, resolving this issue on summary judgment is entirely appropriate here, where the plaintiffs' response to the defendants' thoroughly documented argument consists largely of cursory denials of these factual averments coupled with speculative and conclusory claims of wrongdoing.  In such instances it is well-settled that: "[o]ne cannot create an issue of fact merely by submitting an affidavit denying averments in conflicting affidavits without producing any supporting evidence of the denials."  Thimons v. PNC Bank, NA, 254 F.App'x 896, 899 (Cir. Cir. 2007)(citation omitted).  Thus, "[w]hen a motion for summary judgment is made and supported . . ., an adverse party may not rest upon

mere allegations or denial." <u>Fireman's Ins. Co. Of Newark NJ v. DuFresne</u>, 676 F.2d 965, 968 (3d. Cir. 1982), <u>see</u> <u>Sunshine Books, Ltd. V. Temple University</u>, 697 F.2d 90, 96 (3d. Cir. 1982)."[A] mere denial is insufficient to raise a disputed issue of fact, and an unsubstantiated doubt as to the veracity of the opposing affidavit is also not sufficient." <u>Lockhart v. Hoenstine</u>, 411 F.2d 455, 458 (3d. Cir. 1969).  Furthermore, "a party resisting a [Rule 56] motion cannot expect to rely merely upon bare assertions, conclusory allegations or suspicions." <u>Gans v. Mundy</u>, 762 F.2d 338, 341 (3d. Cir. 1985)(citing <u>Ness v. Marshall</u>, 660 F.2d 517, 519 (3d. Cir. 1981)).

Following a thorough review of the evidence supplied by the parties, and a review of the plaintiff's self-serving declaration, we do not find sufficient evidence to support plaintiff's claims.  Moreover, as explained below, we find that a number of plaintiff's claims simply lack a sufficient legal basis.  Accordingly, for the reasons explained below, we will recommend that the motions for summary judgment be granted.

## 2.   42 U.S.C. § 1983

Plaintiff has brought this lawsuit under 42 U.S.C. § 1983.  The text of that statute provides as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be

> subjected, any person of the United States or other person
> within the jurisdiction thereof to the deprivation of any
> rights, privileges, or immunities secured by the
> Constitution and laws, shall be liable to the party injured in
> an action at law, suit in equity, or other proper proceeding
> for redress . . . .

42 U.S.C. § 1983.  Section 1983 is not itself a source of substantive rights, but is

rather a vehicle that plaintiffs may use in order to seek redress against state actors for

alleged violations of rights under the Constitution or other federal law, including

under the Eighth Amendment to the United States Constitution. City of Oklahoma

City v. Tuttle, 471 U.S. 808, 816 (1985); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d

Cir. 1996).

### 3.    Requirement of State Action and Personal Involvement in the Conduct Alleged

Furthermore, as the statute indicates, § 1983 permits lawsuits against state

actors, rather than against private citizens.  In order to hold a private citizen liable for

a violation under § 1983, the citizen must be "jointly engaged with state officials in

the prohibited action . .. as a 'willful participant in joint activity with the State or its

agents.'" Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 195 (3d Cir. 1995)

(quoting United States v. Price, 383 U.S. 787, 794 (1966)).  Indeed, "[t]he

interdependence between the state and private actor must be pronounced before the

law will transform the private actor into a state actor." Groman v. Twp. of Manalapn,

47 F.2d 628, 638 (3d Cir. 1995).  Moreover, as liability under § 1983 is personal in nature, it "can only follow personal involvement in the alleged wrongful conduct, shown through specific allegations of personal direction or of actual knowledge and acquiescence."  Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988).

In this case, the plaintiff has failed to come forward with sufficient evidence to show that there is a genuine issue of material fact regarding whether  Ralph Horne and Keith Murphy, both of whom were private citizens during the relevant times in this action, can be liable as state actors, or for conspiring with state actors, under 42 U.S.C. § 1983.  These two defendants are thus entitled to summary judgment for this reason alone.

Furthermore, the plaintiff has failed to identify evidence to show a genuine issue of material fact that any of the other Township defendants had any personal involvement in making allegations to the Ethics Commission, or in the investigation that ensued, or in disseminating information to the press or the public regarding these matters during the 2007 general election.  We thus find that the Township defendants are entitled to summary judgment on plaintiff's claims simply for lack of personal involvement in the matters alleged, as well as because plaintiff has failed to support his claims that the parties individually or collectively violated his First Amendment right to pursue political office, as discussed below.

### 3.    The Plaintiff Lacks Evidence to Support His Claims of Conspiracy Under 42 U.S.C. § 1983

With respect to claims brought for alleged conspiracies under 42 U.S.C. § 1983, a plaintiff alleging that defendants conspired with one another must produce evidence that there was a "meeting of the minds" among the alleged conspirators, see Starzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2011) (quoting Adickes v. S.H. Kress & Co., 398 U.S. 144, 158 (1970)), and that "two or more conspirators reached an agreement to deprive him or her of a constitutional right 'under color of law.'" Konopka v. Borough of Wyoming, 383 F. Supp. 2d 666, 672 (M.D. Pa. 2005) (citing Parkway Garage, Inc. v. City of Phila., 5 F.3d 685, 700 (3d Cir. 1993)); see also Ammlung v. City of Chester, 494 F.2d 811, 814 (3d Cir. 1974).

Additionally, the plaintiff alleging a conspiracy must produce evidence to support particularized allegations detailing "(1) the period of the conspiracy, (2) the object of the  conspiracy, and (3) certain actions of the alleged conspirators taken to achieve that purpose." Labalokie v. Capital Area Intermediate Unit, 926 F. Supp. 503, 508-09 (M.D. Pa. 1996) (citations omitted); see also Warren v. Luzerne County, No. 3:09-CV-946, 2010 WL 521130, *7 (M.D. Pa. Feb. 9, 2010) (observing that following the Supreme Court's decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), "general allegations of conspiracy are not sufficient.") (quoting St. Clair

v. Citizens Fin. Group, 340 F. App'x 62, 65 (3d Cir. 2009)).  Mere evidence showing

parallel conduct will not be found to suggest a conspiracy, and likewise "a conclusory

allegation of agreement at some unidentified point does not supply facts adequate to

show illegality."  Id. (quoting Twombly, 550 U.S. at 556-57)).  Furthermore, a viable

conspiracy claim under 42 U.S.C. § 1983 requires that a plaintiff come forward with

evidence to show an "actual deprivation of a right secured by the Constitution and

laws.  Mere proof of a conspiracy is insufficient to establish a § 1983 claim."

Henderson v. City of Phila., No. Civ. A. 98-3861, 1999 WL 482305, *16 (E.D. Pa.

July 12, 1999) (citations omitted).

Applying these legal guidelines to the claims in this case, we find that the

evidence of record in this action reveals only two overt acts showing any connection

between the Township defendants and the Ethics Commission defendants.  In the

first, it is undisputed that Ralph Horne – who at this time was not an elected township

official, but merely a private citizen – filed a complaint regarding Roger Snyder with

the Ethics Commission in 2007.  The Ethics Commission defendants maintain that

there is no further evidence to show that Ralph Horne communicated with them in

any other way, or at any other time relevant to this lawsuit, other than to be

interviewed by Daniel Bender as part of the investigation into the ethics claim.  In the

second instance, the Ethics defendants concede that Daniel Bender met with and

interviewed a number of witnesses, including Roger Snyder, as part of his investigation into the ethics allegations leveled against the plaintiff.

Plaintiff purports to deny the facts upon which the Ethics defendants rely, but his efforts in this regard are unavailing. The Ethics Commission defendants have come forward with citation to record evidence showing that Ralph Horne filed a complaint against Roger Snyder with the Ethics Commission in 2007. Nothing in the evidence indicates that Ralph Horne made any further contact or communication with the Ethics Commission defendants, other than to participate in interviews that Daniel Bender conducted with Mr. Horne, non-defendant Charles Kraus, and other witnesses, including the plaintiff himself. The record simply does not contain any other evidence to support plaintiff's claim that the Township defendants conspired among themselves, or with one or more members of the Ethics Commission, or with Keith Murphy, in furtherance of an alleged scheme to violate the plaintiff's First Amendment rights.

The evidence further indicates that the investigation that was conducted into the complaint against Mr. Snyder was done in accordance with established procedures, (Contino Dep., at 54), and we cannot perceive how evidence that the Ethics Commission defendants followed standard procedures for investigating a formal ethics complaint made by a private citizen and, later, by the chief of a local

police department, can somehow be converted into evidence that this same conduct amounts to a conspiracy to violate the plaintiff's First Amendment rights, or that it even supports plaintiff's argument that the remaining defendants in this action conspired among themselves to violate the plaintiff's right.   There is further no evidence to support his allegation or suggestion that one or more of the Ethics defendants leaked or disclosed information relating to their investigation into Mr. Snyder to local media outlets or to any of the defendants in this case.

In summary, plaintiff had the burden of coming forward with some evidence to support his claim that the defendants had an agreement, or "meeting of the minds" with one another to deprive plaintiff of his First Amendment right to run for political office.   Plaintiff has simply not pointed to any record evidence developed by the parties during discovery in this case to support these claims.

In this regard, as noted above, we do not find that plaintiff can avoid his failure to identify record evidence to support his claims by relying upon a self-declaration that he offered, despite having already been deposed in the case, particularly as the declaration itself relies not on evidence, but on the plaintiff's own interpretation of events and, essentially, opinion testimony.   See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990) (the nonmoving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the

complaint or answer with the conclusory allegations of an affidavit."); Iseley v. Beard, No. 02-2006, 2009 U.S. Dist. LEXIS 52014, *32 (M.D. Pa. Mar. 30, 2010) (conclusory allegations contradicted by documentary evidence cannot be accepted as true).  Viewing the declaration this way, and finding it to be lacking in evidentiary value, as it is often based on little more than the plaintiff's own subjective interpretation of the facts, or his own speculative inferences or unfounded assertions, we find that it is insufficient to create a dispute of material fact regarding plaintiff's claims of conspiracy, particularly in the face of overwhelming evidence undermining his claims of conspiracy.

As the discussion of the factual background of this case shows, there is simply a lack of evidence to support plaintiff's bare assertions that the remaining defendants conspired against him.  Although some of the defendants may have known one another, or supported a different political candidate, or shared a hope that the plaintiff would fail in his bid to gain re-election to the Township Board of Supervisors, these generic facts fall far short of suggesting, much less supporting, the sort of conspiracy alleged in this case.  Although the plaintiff is entitled to have disputes of fact resolved in his favor on summary judgment, and for inferences to be construed in his favor, those inferences must have some evidentiary basis, and must be reasonable.  In this

case, the evidence shows that the inferences the plaintiff urges the Court to make are neither reasonable nor supported by facts.

### 4.    Plaintiff Lacks Evidence of a First Amendment Violation With Respect to His Campaign For Political Office

Not only does plaintiff lack evidence to support his claim that the parties conspired with one another, but he lacks evidence to support the underlying claim that his First Amendment rights were violated as a result of any such alleged conspiracy.  In order to prevail on his conspiracy claim, the plaintiff is required not only to come forward with evidence of an actual conspiracy, or agreement, but also to identify evidence to support his claim that the parties violated his First Amendment rights, since "a conspiracy claim brought under § 1983 depends upon the 'actual deprivation of a right secured by the Constitution and laws.  Mere proof of a conspiracy is insufficient to establish a section 1983 claim.'"  Henderson v. City of Phila., No. Civ. A. 98-3861, 1999 WL 482305, *16 (E.D. Pa. July 12, 1999) (quoting Ritchie v. Jackson, 98 F.3d 1335 (4th Cir. 1996) (further citations omitted). In this case, the plaintiff has failed to come forward with evidence not only in support of his claim of a conspiracy to violate his First Amendment rights, but he has failed to identify evidence to show a violation of those rights in the first place.

First, plaintiff has not identified any evidence to show that his campaign efforts were curtailed in any way, or that the defendants somehow chilled his political activity or hindered his campaign.  Indeed, the undisputed evidence shows only that plaintiff's campaign was successful, and that he was easily reelected to his position as a Township supervisor.

But aside from the fact that plaintiff's political campaign was apparently ultimately unaffected by Ralph Horne's complaint to the Ethics Commission, and the subsequent investigation into the plaintiff's admitted use of public resources to benefit his campaign, the conduct of which the plaintiff takes greatest issue is itself protected.  Thus, in a decision also recognizing that the right to run for political office is itself protected activity, the Supreme Court observed:

> The free exchange of ideas provides special vitality to the process traditionally at the heart of American constitutional democracy – the political campaign.  "[I]f it be conceded that the First Amendment was 'fashioned to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people,' then it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."

Brown v. Hartlage, 456 U.S. 45, 53 (1982) (quoting Monitor Patriot Co. v. Roy, 401 U.S. 265, 271-72 (1971)).  In this case, the plaintiff complains, in part, that certain as of yet unidentified individuals were distributing campaign propaganda during the

2007 general election disparaging the plaintiff and referring to a possible state ethics investigation into his conduct as an elected official. Although this conduct may well have been harmful to the plaintiff's campaign, and may have seemed injurious to him personally, much of the conduct also appears to have fallen squarely within the constitutionally protected exchange of information during a public political campaign.

Furthermore, although the plaintiff complains that some as of yet unidentified person leaked information to the press about the ethics investigation, even if the plaintiff had been able to find evidence to support his allegation that one of the defendants must have been responsible for the leak, "publicizing allegations of unethical conduct on the eve of an election . . . or . . . doing so while also disclosing that an Ethics Act complaint was filed with the Commission" is speech protected by the First Amendment unless the speech is shown to be false or malicious. See Stilp v. Contino, 613 F.3d 405, 414 (3d Cir. 2010) (citing New York Times Co. v. Sullivan, 376 U.S. 254 (1964)). Thus, the very conduct of which the plaintiff chiefly complains has recently been held to be protected by the First Amendment. We cannot perceive how the plaintiff can support his own claims of First Amendment violations

by arguing that other citizens exercised their own rights to engage in conduct protected by the First Amendment.[4]

In this case, as discussed above, the essential facts that led to the State Ethics Commission initiating an investigation into Mr. Snyder's use of Township resources and property were essentially undisputed. This is particularly true with respect to the plaintiff's use of the Township copier, and its employees, to run copies of campaign materials during the primary and general election in 2007. Indeed, the plaintiff acknowledged that he had asked Ms. Willenbech to make 1,600 color copies of campaign materials in October 2007. Although Mr. Snyder has also complained that he has being investigated, unjustly, for other alleged ethical violations, including misuse of Township property and resources, the only information that became public concerned Mr. Snyder's use of the Township copier and staff to create campaign materials in 2007. The evidence indicates that this conduct – conduct that Mr. Snyder acknowledged generally to be true – is the only aspect of the ethics allegations that became public prior to the 2007 general election.

The fact that this information was publicized does not give rise to a First Amendment claim, and the Third Circuit's decision in Stilp makes it clear beyond

---

[4] We again observe that the plaintiff has not come forward with evidence to show that any of the defendants actually did engage in this conduct.

argument that even if the defendants in this lawsuit had publicized information relating to the investigation – something they have all denied – the dissemination of that information to voters in West Donegal Township or elsewhere would be protected First Amendment activity.

Moreover, even if the Third Circuit had decided <u>Stilp</u> differently, and the plaintiff could somehow maintain his claim that publicizing the fact of an official investigation was unlawful or otherwise supported a claim that the publication violated his own First Amendment rights, plaintiff lacks any evidence to show that any of the defendants leaked information to the press about the ethics investigation in 2007, or that they took other action that could conceivably implicate his own First Amendment rights.

In conclusion, we find that the plaintiff has not produced sufficient evidence to support his claims that the defendants conspired with one another to violate his First Amendment rights, and we do not find that there is evidence that the defendants individually violated the plaintiff's right.  First, defendants Horne and Murphy are entitled to summary judgment because, as private citizens, they are not properly subject to liability under 42 U.S.C. § 1983, and plaintiff has failed to support his claims that these two individuals should be considered state actors for purposes of his claims in this case.  In addition, plaintiff has utterly failed to point to evidence that

would support his claims that any of the defendants conspired with one another for the purpose of violating his First Amendment rights.  Lastly, the very conduct of which the plaintiff chiefly complains – the publication about an official ethics investigation into the plaintiff's conduct in 2007 – is itself subject to First Amendment protection.  Even if it were not so protected, the plaintiff has not been able to develop evidence to support his claims that any of the remaining defendants in this case are responsible for publicizing this information – information that was manifestly true at the time, and which concerned allegations about conduct that the plaintiff essentially acknowledged as being true.  For these reasons, we find that the defendants are entitled to summary judgment on plaintiff's remaining claims.

### 5.    <u>The Defendants Are Entitled to Qualified Immunity</u>

Finally, even if Snyder had stated a colorable constitutional claim, all of the defendants other than Ralph Horne and Keith Murphy would nevertheless be entitled to qualified immunity from these claims for damages.[5]   In order to establish a civil rights claim Snyder must show the deprivation of a right secured by the United States Constitution or the laws of the United States. Satisfying these elements alone,

---

[5] As noted elsewhere in this report, Keith Murphy has never been a governmental employee or state actor, and although Ralph Horne has been elected to local office since the events in this lawsuit took place, he was not a governmental official at the relevant times in this action.

however, does not guarantee that Snyder is entitled to recover damages from these public officials. Government officials performing "discretionary functions," are insulated from suit if their conduct did not violate a "clearly established statutory or constitutional right[] of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Pearson v. Callahan, —U.S.—, 129 S. Ct. 808, 815 (2009). This doctrine, known as qualified immunity, provides officials performing discretionary functions not only with a defense to liability, but also "immunity from suit." Crouse v. S. Lebanon Twp., 668 F. Supp. 2d 664, 671 (M.D. Pa. 2009) (Conner, J.) (citations omitted). Qualified immunity:

> balances two important interests – the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably. The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact."

Pearson, 129 S. Ct. at 815.

Determinations regarding qualified immunity, and its application in a given case, require a court to undertake two distinct inquiries. First, the court must evaluate whether the defendant violated a constitutional right. Saucier v. Katz, 533 U.S. 194, 201-02 (2001), abrogated in part by Pearson, 129 S. Ct. 808; Curley v. Klem, 499 F.3d 199, 206 (3d Cir. 2007); Williams v. Bitner, 455 F.3d 186, 190 (3d Cir. 2006).

If the defendant did not actually commit a constitutional violation, then the court must find in the defendant's favor.  Saucier, 533 U.S. at 201.  If the defendant is found to have committed a constitutional violation, the court must undertake a second, related inquiry to assess whether the constitutional right in question was "clearly established" at the time the defendant acted.  Pearson, 129 S. Ct. at 815-16; Saucier, 533 U.S. at 201-02.  The Supreme Court has instructed that a right is clearly established for purposes of qualified immunity if a reasonable state actor under the circumstances would understand that his conduct violates that right.  Williams, 455 F.3d at 191 (citing Saucier, 533 U.S. at 202).

In order to find that a right is clearly established, "the right allegedly violated must be defined at the appropriate level of specificity." Wilson, 526 U.S. at 615.  The Supreme Court has explained that, at least in some cases, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." Hope v. Pelzer, 536 U.S. 730, 741 (2002) (quoting United States v. Lanier, 520 U.S. 259, 271 (1997) (internal quotation marks and citation omitted)).  In some cases, "officials can still be on notice that their conduct violates established law even in novel factual circumstances." Wilson, 455 F.3d at 191 (quoting Hope, 536 U.S. at 741).

45

The court is no longer required to conduct these two inquiries sequentially, Pearson, 129 S. Ct. at 820, and it may forego difficult constitutional issues and award qualified immunity to a defendant if it is apparent that the defendant did not violate rights that were clearly established at the time the defendant acted. Id. Where a court elects to address the alleged constitutional violations, however, the court's analysis of the merits for purposes of summary judgment merges with analysis of the deprivation of federal rights for purposes of qualified immunity. Gruenke v. Seip, 225 F.3d 290, 299-300 (3d Cir. 2000); Crouse, 668 F. Supp. 2d at 671; see also Grant v. City of Pittsburgh, 98 F.3d 116, 122 (3d Cir. 1996) ("[C]rucial to the resolution of [the] assertion of qualified immunity is a careful examination of the record . . . to establish . . . a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff).")  Because qualified immunity entails a consideration of whether the law was clearly established at the time of a defendant's conduct, this defense, which focuses on the state of the law, presents a question of law for the court, and one which can often be resolved as a matter of law. See Montanez v. Thompson, 603 F.3d 243 (3d Cir. 2010).

In this case, as we have noted, the plaintiff has failed to articulate any viable First Amendment claims that garner sufficient support from the record to create a genuine issue of material fact warranting trial.  Quite the contrary, the evidence of

record simply shows that persons reported a potential ethics violation that Snyder

acknowledged to the state agency charged with the duty of investigating such matters.

That agency then conducted the investigation they were required to undertake, and

ultimately cleared the plaintiff of actionable wrongdoing.   In the meanwhile, the

electorate voted to retain Snyder in office.   On these facts, the defendant public

officials could not reasonably have anticipated that taking actions that were

specifically authorized under state ethics laws would violate some clearly established

constitutional right of the plaintiff.   In short, given the state of the law in this field,

in this setting the defendants simply could not have recognized that their actions

would violate "clearly established statutory or constitutional right[] of which a

reasonable person would have known."  Wilson v. Layne, 526 U.S. 603, 609 (1999).

Therefore, if Snyder had stated a colorable constitutional claim, all of the defendants

other than Ralph Horne and Keith Murphy would nevertheless be entitled to qualified

immunity from these claims for damages.[6]

---

[6] This issue of qualified immunity is properly before us, having been
specifically argued by the Township defendants in their summary judgment
motion, and raised as a defense by the Ethics Commission defendants in their
answer to this complaint. (Doc. 58) In any event, in appropriate cases this Court is
entitled to address this qualified immunity defense *sua sponte*, when appropriate.
See Doe v. Delie, 257 F.3d 309 (3d Cir. 2001) (affirming *sua sponte*
recommendation of qualified immunity by U.S. magistrate judge).

## V.     RECOMMENDATION

Accordingly, for the reasons set forth above, IT IS HEREBY RECOMMENDED THAT defendants' motions for summary judgment (Docs. 98, 102, 105) be GRANTED and this action be closed.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 16th day of February 2012.


*/s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge